IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 2:07-CV-00810 BSJ |
| | ) | 2:10-CV-00127 BSJ |
| v. | ) | (Consolidated) |
| | ) | |
| DOUGLAS BROWN; BARBARA | ) | |
| BROWN; UTAH STATE TAX | ) | |
| COMMISSION; GILBERT JENSEN; | ) | **FINDINGS OF FACT &** |
| ROBERT TINGEY, AS TRUSTEE | ) | **MEMORANDUM OPINION** |
| FOR THE D.E. BROWN FAMILY | ) | **(Fed. R. Civ. P. 52(a))** |
| TRUST, | ) | |
| | ) | |
| Defendants; | ) | |
| | ) | |
| | ) | |
| IN RE: FORECLOSURE OF REAL | ) | |
| PROPERTY: 8282 Big Cottonwood | ) | |
| Canyon Road, Brighton, Salt Lake | ) | |
| County, Utah; Trustor: D.E. Brown | ) | |
| Family, Trust Deed Dated June 22, | ) | |
| 1993. | ) | |

**FILED**
CLERK, U.S. DISTRICT COURT
October 11, 2011 (2:52pm)
DISTRICT OF UTAH

\* \* \* \* \* \* \* \* \*

This case was tried to the court for three days beginning April 25, 2011. After the

close of the evidence, the court heard argument by counsel on April 27th and took the

matter under advisement. (*See* Minute Entry, dated April 25-27, 2011 (dkt. no. 128).)

Having reviewed the testimony and other evidence received at trial and having considered

the arguments of counsel in light of the pertinent legal authorities, the court now rules as

follows:

**JURISDICTION & VENUE**

This is a civil action commenced by the United States to reduce federal income tax assessments to judgment and to foreclose federal tax liens, invoking the jurisdiction of this court pursuant to 28 U.S.C. §§ 1340 & 1345 and 26 U.S.C. §§ 7402 & 7403. Venue is proper pursuant to 28 U.S.C. §§ 1391(b) & 1396 because the tax liabilities accrued in Utah, the defendants reside in Utah, and venue lies in the Central Division of the District of Utah because the real property at issue is located in Salt Lake County, Utah. *See* 28 U.S.C. § 125(2).

**SUMMARY OF THE CLAIMS AND DEFENSES**

The United States' Second Amended Complaint pleaded six causes of action: (1) to reduce federal tax assessments to judgment against Douglas Brown; (2) to reduce federal tax assessments to judgment against Douglas and Barbara Brown; (3) to foreclose federal tax liens against real property held by Douglas and Barbara Brown; (4) to foreclose federal tax liens against real property held by Robert Tingey, trustee of the D.E. Brown Family Trust, as the nominee/alter-ego of Douglas and Barbara Brown, and to set aside the fraudulent transfer of the property; (5) to foreclose federal tax liens against real property held by Robert Tingey, trustee of the Trust, as a resulting trust for the benefit of Douglas and Barbara Brown; and (6) to obtain an exception to discharge pursuant to 11

U.S.C. § 523(a)(1)(C) because of the Browns' tax avoidance.[1]  On December 8, 2010, this

court granted summary judgment in favor of the United States on its first two claims as

against:

> (1) Douglas Brown for assessed gift taxes and interest, and accrued but
> unassessed interest, for the years 1994 and 1995 in the amount of
> $165,714.38, plus statutory interest from December 31, 2010, pursuant to
> 28 U.S.C. 1961(c)(i), 26 U.S.C. §§ 6601 and 6621; and

> (2) Douglas and Barbara Brown for assessed income taxes and interest, and
> accrued but unassessed interest, for the years 1993, 1994, 1995, 1996, 1999,
> 2001, and 2002 and assessed income taxes, penalties and interest, and
> accrued but unassessed penalties and interest for 2005, in the amount of
> $1,910,710.42, plus statutory interest from December 31, 2010, pursuant to
> 28 U.S.C. 1961(c)(i), 26 U.S.C. §§ 6601 and 6621.

(Order Granting United States' Motion for Summary Judgment with Regard to Tax

Assessments, filed March 7, 2011 (dkt. no. 112).)  Thereafter, only the United States'

federal tax lien foreclosure claims remained to be tried in this case.

The United States asserts that it is entitled to foreclose valid federal tax liens

arising from the Browns' unpaid federal income tax and gift tax liabilities on certain real

property located at Brighton, Utah (hereinafter "the Brighton Ski Cabin").  The

government relies upon three legal theories: (1) the federal tax liens attach to the Brighton

Ski Cabin because the D.E. Brown Family Trust (hereinafter "the Trust"), which held

record title to the cabin, is the nominee of defendants Douglas and Barbara Brown; (2)

the federal tax liens attach because the Browns were the beneficial owners of 100% of the

---

[1](*See* Second Amended Complaint, filed February 1, 2010 (dkt. no. 88).)

Brighton Ski Cabin property, as Douglas Brown's intention and actions in funding the purchase of the cabin property created a resulting trust by which the Browns retained the beneficial interest in the cabin property; and (3) the federal tax liens attach because the transfer of the Brighton Ski Cabin to the Trust was fraudulent as to creditors and may be set aside. The third theory appears to be an alternative to the first two theories, but either way, the United States insists that the Browns may be held to have been the true legal owners of the cabin property for the purpose of enforcing the Browns' federal tax liens.

The Browns contend that the federal tax liens do not attach to the Brighton Ski Cabin property because: (1) a nominee relationship is not recognized by Utah courts as providing a property interest to which a federal tax lien could attach; (2) the Trust is a valid irrevocable trust over which the Browns exercised no control; (3) the Browns' actions did not create a resulting trust because the Brighton Ski Cabin was purchased by the Trust prior to the tax obligations being assessed; (4) the Trust actually having purchased the Brighton Ski Cabin property, the Browns did not transfer that property to the Trust, so no fraudulent transfer could have occurred; and (5) the United States had waived any lien interest in the cabin property by stipulation in 1998.

**UNCONTROVERTED FACTS**

A number of facts pertaining to the federal tax lien claims are not in genuine

dispute:[2]

**A.  Douglas and Barbara Brown's Federal Tax Liabilities**

1.  Douglas and Barbara Brown ("the Browns") were married on December 7, 1979.

2.  The Browns failed to timely file their 1993 federal income tax return with the IRS and instead filed their return on September 11, 1997, and reported $349,926.00 in income tax.  This amount was assessed against them on December 8, 1997.   Notice and demand for payment was sent to the defendants on December 8, 1997.   The current balance due for their 1993 tax year is $1,184,351.14.

3.  The Browns failed to timely file their 1994 federal income tax return with the IRS and instead filed their return on September 11, 1997, and reported $241,930.00 in income tax.  This amount was assessed against them on December 8, 1997.   Notice and demand for payment was sent to the defendants on December 8, 1997.  The current balance due for the their 1994 tax year is $779,831.66.

4.  The Browns failed to timely file their 1995 federal income tax return with the IRS and instead filed their return on September 11, 1997, and reported $53,405.00 in income tax.  This amount was assessed against them on December 8, 1997.  Notice and demand for payment was sent to the defendants on December 8, 1997.  The current

---

[2]Almost all of the uncontroverted facts set forth herein were extracted from Part III of the "[Second Revised Proposed] Joint Pre-Trial Order," submitted to the court by counsel on April 1, 2011.  A final pretrial order was not entered in this case.

balance due for their 1995 tax year is $116,360.54.

5. The Browns failed to timely file their 1996 federal income tax return with the IRS and instead filed their return on November 30, 1998, and reported $87,753.00 in income tax. This amount was assessed against them on February 22, 1999. Notice and demand for payment was sent to the defendants on February 22, 1999. An additional $21,381.00 in taxes was assessed on December 31, 2001, as a result of an examination and audit. The current balance due for their 1996 tax year is $290,381.70.

6. The Browns failed to timely file their 1999 federal income tax return with the IRS and instead filed their return on February 4, 2001, and reported $2,443.00 in income tax. This amount was assessed against them on March 26, 2001. Notice and demand for payment was sent to the defendants on March 26, 2001. The current balance due for their 1999 tax year is $6,121.34.

7. The Browns filed their 2001 federal income tax return with the IRS on April 15, 2002, and reported $5,951.00 in income tax. This amount was assessed against them on May 6, 2002. Notice and demand for payment was sent to the defendants on May 6, 2002. An additional $4,818.00 in taxes was assessed on March 1, 2004, as a result of an examination and adjustment. The current balance due for their 2001 tax year is $12,629.00.

8. The Browns filed their 2002 federal income tax return with the IRS on April 15, 2003, and reported $12,028.00 in income tax. This amount was assessed against

them on June 2, 2003.  Notice and demand for payment was sent to the defendant on June

2, 2003.  The current balance due for their 2002 tax year is $12,209.82.

9.  The Browns filed their 2005 federal income tax return with the IRS on April

15, 2006, and reported $6,803.00 in income tax.   This amount was assessed against them

on June 5, 2006.   Notice and demand for payment was sent to the defendant on June 5,

2006.  The current balance due for their 2005 tax year is $8,887.03.

10.  Douglas Brown filed a 1994 federal gift tax return with the IRS on September

11, 1997, and reported $11,159.00 in gift tax.  This amount was assessed against him on

October 27, 1997.  Notice and demand for payment was sent to the defendant on October

27, 1997.  The current balance due for the 1994 tax year is $41,879.14.

11.  Douglas Brown filed a 1995 federal gift tax return with the IRS on September

11, 1997, and reported $48,957.00 in gift tax.  This amount was assessed against him on

October 27, 1997.  Notice and demand for payment was sent to the defendant on October

27, 1997.   The current balance due for the 1995 tax year is $166,221.19.

**B. Notices of Federal Tax Lien**

12.  On July 17, 1998, a delegate of the Secretary of Treasury recorded in the

County Recorder's Office for Salt Lake County, located in Salt Lake City, Utah, a notice

of federal tax lien against Douglas Brown for unpaid federal gift tax liabilities for the

1994 and 1995 tax years.  The notice of federal tax lien was re-filed in the County

Recorder's Office on November 6, 2007.

13.  On April 17, 1998, a delegate of the Secretary of Treasury recorded in the County Recorder's Office for Salt Lake County, located in Salt Lake City, Utah, a notice of federal tax lien against Douglas Brown and Barbara Brown for unpaid federal income tax liabilities for the 1993, 1994 and 1995 tax years.  The notice of federal tax lien was re-filed with the County Recorder's Office on November 6, 2007.

14.  On October 2, 2000, a delegate of the Secretary of Treasury recorded in the County Recorder's Office for Salt Lake County, located in Salt Lake City, Utah, a notice of federal tax lien against Douglas Brown and Barbara Brown, for unpaid federal income tax liabilities for the 1996 tax year.  The notice of federal tax lien was re-filed with the County Recorder's Office on June 30, 2008.

15.  On April 22, 2004, a delegate of the Secretary of Treasury recorded in the County Recorder's Office for Salt Lake County, located in Salt Lake City, Utah, a notice of federal tax lien against Douglas Brown and Barbara Brown, for unpaid federal income tax liabilities for the 1999, 2001 and 2002 tax years.

16.  On August 25, 2006, a delegate of the Secretary of Treasury recorded in the County Recorder's Office for Salt Lake County, located in Salt Lake City, Utah, a notice of federal tax lien against Douglas Brown and Barbara Brown, for unpaid federal tax liabilities for the 2005 tax year.

17.  On May 3, 2007, a delegate of the Secretary of Treasury recorded in the County Recorder's Office for Salt Lake County, located in Salt Lake City, Utah, a notice

of federal tax lien against Robert Tingey, Trustee for D.E. Brown Family Trust, as nominee, alter-ego, transferee of Douglas Brown, for unpaid federal gift tax liabilities for the 1994 and 1995 tax years. The notice of federal tax lien was re-filed with the County Recorder's Office on November 6, 2007.

18. On May 3, 2007, a delegate of the Secretary of Treasury recorded in the County Recorder's Office for Salt Lake County, located in Salt Lake City, Utah, a notice of federal tax lien against Robert Tingey, Trustee for D.E. Brown Family Trust, as nominee, alter-ego, transferee of Douglas Brown and Barbara Brown, for unpaid federal income tax liabilities for the 1993, 1994, 1995, 1996, 1999, 2001, 2002, and 2005 tax years. The notice of federal tax lien was re-filed with the County Recorder's Office on November 6, 2007 as to tax years 1993, 1994 and 1995 and on June 30, 2008 as to tax year 1996.

**C. Douglas Brown's Criminal History**

19. On December 13, 1995, Douglas Brown was indicted on 174 counts of securities fraud and conspiracy related to his dealings with Wellshire Securities.[3] On May 2, 1996, a superseding indictment was returned by the grand jury, alleging 250 counts against Mr. Brown.[4]

---

[3](*See* Indictment, filed December 13, 1995 (dkt. no. 1), in *United States of America vs. Douglas Brown*, Case No. 2:95-CR-245 DB (D. Utah).)

[4](*See* Superseding Indictment, filed May 2, 1996 (dkt. no. 161), in *United States of America vs. Douglas Brown*, Case No. 2:95-CR-245 DB (D. Utah).)

20.  On January 24, 1997, Douglas Brown pled guilty to three counts of the superseding indictment,[5] and on September 29, 1997, he was sentenced to forty-two months of imprisonment followed by three years of supervised release; he was also ordered to pay restitution.[6]

### D.  The D.E. Brown Family Trust

21. The D.E. Brown Family Trust was created as an irrevocable trust in 1993, with Douglas Brown's brother, Mark Brown, serving as the trustor.  Robert Tingey, Barbara Brown's brother-in-law, was named trustee.  The beneficiaries of the Trust included Barbara Brown and the Browns' four children.

22.  Douglas Brown transferred various assets into the Trust, including stocks, notes, and accounts receivable, and he was the only one to do so.

### E.  The Browns' Bankruptcy Proceeding

23.  Douglas and Barbara Brown filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Utah on March 3, 2009, Case No. 09-22961.

24.  On July 7, 2009, Douglas and Barbara Brown received a general order of discharge in their bankruptcy case.

---

[5](*See* Minute Entry, dated January 24, 1997 (dkt. no. 245), in *United States of America vs. Douglas Brown*, Case No. 2:95-CR-245 DB (D. Utah).)

[6](*See* Judgment in a Criminal Case, filed September 29, 1997 (dkt. no. 304), in *United States of America vs. Douglas Brown*, Case No. 2:95-CR-245 DB (D. Utah).)

**FINDINGS OF FACT**

Based upon the evidence duly admitted during the trial of this action without a jury, this court makes the following findings of fact pursuant to Fed. R. Civ. P. 52(a)(1):

**A. The Purchase of the Brighton Ski Cabin.**

1. In the Spring of 1993, the owner of the Brighton Ski Cabin,[7] Gilbert Jensen, put the property up for sale through a local real estate agent, Dean Roberts. (Transcript of Trial, dated April 25, 2011 [morning session] ("Tr. 4/25/11am"), at 30:8-20 (testimony of Gilbert Jensen).)

2. On or about June 12, 1993, Douglas and Barbara Brown made an offer to buy the property, and tendered a check as an earnest money deposit in the amount of five thousand dollars ($5,000.00);[8] the Jensens received the offer and earnest money check, and responded with a counteroffer, which the Browns accepted. (*Id.* at 33:20-35:15; *see*

---

[7](*See* Plaintiff's Exhibits 74, 75 & 76 (photographs).) Plaintiff's exhibits will hereinafter be cited as "PX-" followed by the specific exhibit number. Defendants' Exhibits will similarly be cited as "DX-" followed by the specific exhibit number. Defendant Robert Tingey came to trial with his own compilation of exhibits, largely overlapping the exhibits already marked the Government and the Browns, but often assigning different exhibit numbers. Where a Tingey-listed exhibit was offered and received under a "PX" or "DX" number, the exhibit will be referenced herein solely by that "PX" or "DX" designation. (*See* Final Exhibit List, filed April 27, 2011 (dkt. no. 125).) If a Tingey-listed exhibit was offered and received apart from those exhibits offered by the Government or the Browns, it will hereinafter be cited as "TX-" followed by the specific exhibit number on the Tingey list.

[8]Mr. Brown testified that he paid the $ 5,000 earnest money deposit himself. (Transcript of Trial, dated April 26, 2011 [morning session] ("Tr. 4/26/11am"), at 227:15-18.)

PX-3, PX-4.)

3.  On or about June 22, 1993, Gilbert Jensen quitclaimed undivided one-half interests in the Brighton Ski Cabin property to two trusts, the Gilbert Willard Jensen Trust and the Myrna Merrill Jensen Trust.  (*Id.* at 37:12-38:3; *see* PX-5.)

4.  On or about June 22, 1993, the Jensen trusts executed a warranty deed conveying their respective undivided one-half interests in the Brighton Ski Cabin property to Robert Tingey as trustee of the D.E. Brown Family Trust.  (*Id.* at 38:7-39:2; *see* PX-6.)

5.  At or about the same time, Douglas Brown executed a Trust Deed as to the Brighton Ski cabin property naming the Jensen trusts as beneficiaries, together with a Trust Deed Note in the amount of two hundred thousand dollars ($200,000), payable to the Jensen trusts with interest at a rate of 7.25% per annum.  (*Id.* at 39:6-41:8; *see* PX-7, PX-8.)  The Trust Deed was recorded on June 23, 1993.  (*See* PX-68, at [24]; PX-16.)[9]

6.  An amortization schedule of payments and interest was also prepared and presented to the Jensens and Douglas Brown at closing, as was a similar schedule trackable by individual payments.  (*Id.* at 56:24-59:19; *see* PX-19, PX-20.)

7.  The closing statements for the cabin purchase reflects that the sellers were the Jensen trusts, the buyer was Douglas Brown, and that there was a balance due to the sellers at closing of $71,857.99.  (*Id.* at 46:7-47:9, 48:5-11; *see* PX-11, PX-68 at [32]

---

[9]There is no dispute that Douglas Brown signed these documents, among others, at the June 22, 1993 closing.  (*See* Tr. 4/26/11am, at 228:7-230:1, 232:4-234:8, 238:5-239:14 (testimony of Douglas Brown).)

(buyer's closing statement).)  Mr. Jensen recalled receiving a check from the title company for that amount at closing.  (*Id.* at 47:10-48:1; *see* PX-11, PX-68A.)[10]

8.  The Bill of Sale likewise reflects that the sellers of the property were the Jensen trusts and the buyer was Douglas Brown, consistent with Mr. Jensen's understanding of the sale.  (*Id.* at 49:6-19; *see* PX-12.)[11]  Appended to the Bill of Sale was a list of cabin furnishings that would remain in the cabin after the sale, and a list of items that the Jensens would be taking with them.  (*Id.* at 49:20-50:9.)

9.  The Jensens and Douglas Brown also executed a Security Agreement as to the $200,000 note obligation, identifying as collateral a Thiokol model no. 1400 Snowcat and a stock certificate representing one share in the Silver Lake Company, "including all water rights."  (*Id.* at 41:12-42:6; *see* PX-9, PX-10.)  The Snowcat provided "access from the parking lot over the snow and you could travel to the cabin and park it in the garage of the cabin."  (*Id.* at 41:22-24.)  Given the scarcity of culinary water for cabins at Brighton, the share in Silver Lake water company stock "represented something of considerable value,"  which Mr. Jensen opined "at that time was probably worth $50,000 on the

_____

[10]Douglas Brown testified that using his own personal funds, he obtained from First Security Bank of Utah, N.A., a cashier's check payable to Title West in the amount of $78,982.99 to cover this $71,857.99 down payment.  (Tr. 4/26/11am, at 237:8-21; *see* PX-68, at [30]; *see also id.* at 226:19 ("It was just money that I had from various sources.").)

[11]The same is true of the Seller's Escrow Instructions.  (Tr. 4/25/11am, at 50:17-51:4; *see* PX-13.)

market." (*Id.* at 43:16, 19-20.)[12]  Mr. Jensen planned to retain possession of the water share until the $200,000 note was fully paid, and then "turn over that share of water stock to Mr. Brown." (*Id.* at 43:23-44:2.)  A stock certificate was prepared reflecting the intended transfer of the water share to Douglas Brown, and was signed by the Jensens. (*Id.* at 52:14-24; *see* PX-15.)

10.  Consistent with the Security Agreement, the Jensens and Douglas Brown executed a Uniform Commercial Code Financing Statement covering the Snowcat and the Silver Lake water share. (*Id.* at 51:12-52:6; *see* PX-14, PX-15, PX-18.)

11.  Subsequent to the June 23, 1993 closing, a second Trust Deed was prepared as to the Brighton Ski cabin property naming the Jensen trusts as beneficiaries, and Douglas Brown "and Robert Tingey as trustee for the D. E. Brown Family Trust" as trustors, and appears to have been recorded on July 15, 1993. (*Id.* at 53:14-54:7; *see* PX-16.)[13]  A second Trust Deed Note was also prepared, adding Robert Tingey as an obligor, again as trustee for the D. E. Brown Family Trust. (*Id.* at 54:25-55:17; *see* PX-17.)

12.  Gilbert Jensen testified that he understood that "it would be the Browns who would be making the payments on this note." (*Id.* at 59:3-8.)

_____

[12]Mr. Jensen recalled that "there were some lots down in the Brighton bowl area that they had no water shares for those lots and they couldn't sell them." (Tr. 4/25/11am, at 43:17-19.)

[13]It appears that the original June 22, 1993 Trust Deed (PX-7) was altered by adding "and ROBERT TINGEY, trustee for the D..E. BROWN FAMILY TRUST, dated 6-22-93," as a named trustor, and adding Tingey's notarized signature at the bottom of the third page, also dated July 15, 1993. (*See* PX-16.)

### B.  Payment History re: the $200,000 Trust Deed Note

13.  Mr. Jensen kept a written record of payments as he received them, starting in October 1993.  (*Id.* at 60:2-65:21; *see* PX-21.)

14.  Mr. Jensen testified that he received the first seventeen quarterly payments as checks from the Browns, from Robert Tingey through the Winder and Haslam law firm, and from Brighton Factor Dealers.  (*Id.*)

15.  Because of some personal "troubles" experienced by Douglas Brown, Robert Tingey requested that the Jensens agree to accept interest-only payments on the Trust Deed Note for a period of three years (1998, 1999 and 2000).  The Jensens agreed, and accepted interest-only payments starting with the eighteenth payment in December 1997 through the twenty-ninth payment in October of 2000; regularly scheduled payments resumed with the thirtieth payment in January of 2001.  (*Id.* at 65:22-74:9; *see* PX-21, PX-22, PX-23.)

16.  Through October of 2007, Mr. Jensen recorded having received fifty-seven payments on the Brighton Ski Cabin obligation (including the interest-only payments in 1997-2000 and October 2004-January 2005[14]), and they came from a variety of sources, most of them closely tied to Douglas Brown.

17.  Many of those payments came directly from the Browns or from sources either controlled or directed by Douglas Brown: (1) at least five times, starting with the first two

---

[14](*See* Tr. 4/26/11am, at 252:19-253:16 (testimony of Douglas Brown); PX-24.)

quarterly payments ($5,496.00) in October 1993 and January 1994, Douglas or Barbara Brown made payments directly to the Jensens; (2) at least five payments ($5,496.00, July 1996-July1997) came from Mr. Brown's business, Brighton Factor Dealers; (3) one payment ($5,496.00) came in April 2005 from Parry, Anderson and Gardiner, a law firm representing Mr. Brown; and (4) at least three payments ($5,480.00) and a partial payment ($3,660.00) in 2007 came from Sundance Homes, an employer of Douglas Brown. (*See* Transcript of Trial, dated April 25, 2011 [afternoon session] ("Tr. 4/25/11pm"), at 76:18-81:18, 84:13-87:10, 89:14-93:16, 117:13-121:8 (testimony of Gilbert Jensen); PX-21.)

18. At least twelve payments (many of them "interest-only") from December 1997 through October 2000 came from the Wrenhaven Trust, another Brown-funded trust for which Mr. Tingey also served as trustee.[15]

_____

[15]The Wrenhaven Trust was another Utah trust entity created by Douglas Brown's brother, Mark Brown as trustor, with Barbara Brown and the Brown children as beneficiaries and Robert Tingey designated as trustee. Douglas Brown testified that he contributed a parcel of real estate located on Wrenhaven Lane to that trust (hence the name "Wrenhaven Trust"), which property was subsequently sold. The Wrenhaven Trust received the proceeds of that sale, reinvested in another home that was subsequently purchased by one of the Brown children, the proceeds of which were paid into the trust – $100,000 of which was subsequently loaned to Todd Holloway to facilitate Holloway's purchase of the residential property on Meadowcrest Road in Holladay, Utah where the Browns resided at the time of trial, and for which Douglas Brown pays in lieu of rent an amount equal to Holloway's mortgage payment (which Brown pays directly to Holloway's mortgage company). (Tr. 4/25/11pm, at 125:2-129:19 (testimony of Douglas Brown).) According to Mr. Tingey, the Browns contributed all of the Wrenhaven Trust's assets. (Transcript of Trial, dated April 26, 2011 [afternoon session] ("4/26/11pm"), at

(continued...)

19.  Charles Jorgenson had rented the Brighton Ski Cabin from Douglas Brown for a period of time beginning in October 2005,[16] and at Mr. Brown's direction, Mr. Jorgensen made the October 2005 note payment directly to the Jensens, the forty-ninth payment they had received, followed by four more payments and a partial payment.  (Tr. 4/26/11am, at 256:19-257:19, 276:1-277:5; *see* PX-21.)

20.     It appears that Mr. Tingey made payments to the Jensens drawn on funds ostensibly held by the Trust in its own accounts twenty-five times between 1993 and 2007.  (*See* PX-21, DX-16.)

21.  Many of the payments received from 2001 through 2007 were late, and in January 2007, Mr. Jensen wrote to Douglas Brown, suggesting that Brown consider selling the Brighton Ski Cabin in light of the recent $35,000,000 purchase of the Brighton ski resort, which might enable Brown to pay off the entire balance still owing on the cabin and "leave enough dollars to return your investment."  Brown did not respond to Jensen's letter.  (*Id.* at 93:17-95:6; *see* PX-27.)

22.  In November 2007, Mr. Jensen prepared a written reconciliation of the amount then due from Douglas Brown on the purchase of the Brighton Ski Cabin, which Jensen calculated to be $58,245.24.  (*Id.* at 95:13-96:24; *see* PX-28.)

---

[15](...continued)
342:6-8 (testimony of Robert Tingey).)

[16]Mr. Brown testified that Mr. Jorgensen "basically moved into the cabin for a period of time," that is, for the "[b]etter part of a year, I think. A little over a year maybe." (Tr. 4/26/11am, at 276:4-8.)

23.   Shortly thereafter, Mr. Jensen testified that he accepted an offer from Douglas Brown's brother, James Brown, to purchase the Jensen trusts' remaining interest in the Brighton Ski Cabin property for the remaining balance due on the Trust Deed Note, plus approximately $6,500.00 in attorney's fees that the Jensens had incurred in relation to asserting their interest in the property in dealing with the United States.  (*Id.* at 97:6-101:23.)

24.   James Brown subsequently foreclosed on the Trust Deed securing the unpaid balance on the Trust Deed Note, ending the ownership, possession and use of the cabin property by the Browns and the Trust.

### C.  The Browns' Possession, Control and Use of the Cabin

25.   The Browns took possession of the cabin immediately after its purchase and consistently exercised exclusive control over the property, using the cabin as they pleased.[17]

26.   The Browns used the cabin "[o]ccasionally. Sometimes -- a few times in the summer.  A few times in the winter."  (Tr. 4/26/11am, at 301:7-12 (testimony of Barbara

---

[17]As Douglas Brown testified:

Q Let's talk a little bit about the cabin itself and how it was used. You and your family began using it immediately after purchase; is that right?

A Yes.

(Tr. 4/26/11am, at 246:6-9.)

Brown).)  Douglas Brown testified that his family would use the cabin sometimes for long weekends, sometimes for day trips, and that they would invite friends or business associates to the cabin.  (*Id.* at 246:18-247:13.)

27.    The Browns made use of the cabin property without supervision by or the permission of the Trust or its trustee. (*Id.* at 247:14-17.)

28.    The Browns paid the cabin's utility bills, and paid part of the insurance premiums on the cabin under a policy issued in Douglas Brown's name.  (*Id.* at 302:1-12 (testimony of Barbara Brown); *id.* at 248:10-249:13 (testimony of Douglas Brown); *see* PX-33.)

29.    The Browns also performed maintenance work at the cabin, *e.g.*, the Browns would stain the exterior wood on the cabin.  (*Id.* at 248:3-7 (testimony of Douglas Brown).)

30.    In 2005, Mr. Brown rented the cabin to a friend, Charles Jorgensen, who "stayed up at the cabin quite a bit during that period of time."  As "rent," Jorgenson made the October 2005 note payment directly to the Jensens, followed by four more quarterly payments through October 2006, and he did so at Mr. Brown's direction.  Mr. Tingey as trustee of the Trust knew nothing of this.  (*Id.* at 256:19-257:19, 276:1-277:5 (testimony of Douglas Brown); Tr. 4/26/11pm, at 331:9-11 (testimony of Robert Tingey).)

31.    Mr. Tingey knew little or nothing about how the Browns used the Brighton Ski Cabin.  (*Id.* at 331:1-11 (testimony of Robert Tingey).)

32. In contrast to the Browns, Mr. Tingey took no action to maintain the cabin property. (*Id.* at 331:12-20.)

### D. Douglas Brown's Involvement with the Trust's Other Assets

33. Douglas Brown was the only one who contributed assets to the Trust. (*See* Tr. 4/25/11pm, at 174:19-175:1 (testimony of Douglas Brown); Tr. 4/26/11pm, at 335:16-21, 366:9-20 (testimony of Robert Tingey).)

34. Apart from the Jensen trusts' warranty deed to the Brighton Ski Cabin, all assets held by the Trust were transferred into the Trust from accounts or entities under Douglas Brown's control. (Tr. 4/26/11pm, at 335:16-21 (testimony of Robert Tingey).)

35. In February 1994, Mr. Brown transferred 150,000 shares of Multistack International Ltd. Stock into a Smith Barney account in the name of the Trust as a "gift" to the Trust. (Tr. 4/26/11pm, at 355:16-22 (testimony of Robert Tingey); *see* DX-7.)

36. In a series of transactions between March 1994 and February 1995, the 150,000 shares of Multistack were sold for net aggregate sale proceeds of $173,325.80. (DX-7.)[18] From March 1994 through July 1995, a total of $169,662.00 was transferred to open and fund the Trust's checking account at First Security Bank. (*Id.*; DX-16.)[19]

37. On June 7, 1994, the Trust purchased 57,500 shares of Greater Southwest

---

[18]Additional funds, *viz.*, a December 1994 dividend of $3,927 and accrued interest of $1,369.39 were added to the balance of the Smith Barney account. (*See* DX-7.)

[19]During that same time frame, Mr. Tingey made six payments to the Jensens totaling $32,976. (*See* PX-21.)

Lodging for $575; on September 8, 1994, the Greater Southwest Lodging stock was exchanged for shares of Great Western Asset Group. (Tr. 4/26/11pm, at 357:8-359:10; *see* DX-12.) Mr. Tingey consulted Douglas Brown concerning the stock purchase and the exchange. (*Id.* at 359:12-360:14.)

38. In August 1994, Mr. Brown transferred 30,000 shares of Innovus Multimedia, Inc. stock to the Trust, which was exchanged in November of 2004 for 88,500 shares of Innovus Corporation, which in turn was exchanged in a "reverse 2 for 1 split" for 44,250 shares of Innovus Corporation stock. (*See* DX-7, DX-12; *see id.* at 360:17-24.)

39. In 1995, the assets of the Trust included 30,000 shares of Surgical Technologies stock which had been purchased by the Trust and held in its Union Securities account, for which shares it apparently paid $65,000. (*See* DX-7, DX-12, PX-32.) Those shares were sold in three transactions for $125,587.50 in net proceeds; and on October 20, 1994, Mr. Tingey caused $125,551.50 of the proceeds to be wired to the Trust's account at First Security Bank. (Tr. 4/26/11pm, at 351:23-353:5; *see* DX-7, DX 12, at 3.)

40. Four days later, the Trust purchased another 30,000 shares of Surgical Technologies stock for $90,000, drawn on the Trust's account at First Security Bank. (*See* DX-12, at 3-4.)

41. The Trust's assets also included 200,000 shares of ALPNET (AILP) stock which were purchased by the Trust in April of 1995 for $25,000. (*Id.* at 353:17-354:7;

*see* DX-7.)  The ALPNET shares were purchased using Trust funds derived from the prior sale of Multistack shares through the Trust's Smith Barney account, and Mr. Tingey consulted Douglas Brown before transacting the purchase.  (*Id.* at 354:9-357:3; *see* DX-12.)  Those ALPNET shares were subsequently sold for $196,359.70, less administrative expenses.  (Tr. 4/25/11pm, at 179:22-181:4 (testimony of Douglas Brown); *see* PX-55.)

42.  Transactions in shares of Innovus Multimedia, Great Western Asset Group, Surgical Technologies and ALPNET stock were directly related to the activities of the Wellshire securities entities (*e.g.*, Wellshire Securities (Deutschland) GmbH, Wellshire Services, Inc., Wellshire Securities, Inc.). The Wellshire entities marketed securities to foreign investors, an activity with which Douglas Brown had been directly employed as a stock broker from 1990 to 1995.[20]

43.  By October 1994, Douglas Brown and the Wellshire entities, among others, had been named as defendants in civil litigation brought by German investors, *see, e.g., Hofstadt, et al. vs. Wellshire Securities Inc., et al.*, Civil No. 2:96-CV-00327-DB (D.

---

[20](*See* Tr. 4/25/11pm, at 135:7-136:3.)  As Mr. Brown explained,

> My job at Wellshire Services was to find stock investments for them in privately held companies mostly.  And I was paid, in addition to my cash salary, I was given stock in the amount of five percent of the stock that was ultimately purchased by Wellshire for resale to its German clients.

(*Id.* at 144:2-6.)  Of the Browns' 1993 income, $708,985 was attributable to the value of "the number of shares that I received as a finder basically for those securities from Wellshire Services."  (*Id.* at 14:7-10.)

Utah, filed April 9, 1996); *Wennemann, et al. vs. Douglas E. Brown, et al.*, Civil No.

2:94-CV-967B (D. Utah, filed October 6, 1994); *Eisenreich, et al. vs. Wellshire Sec Inc,*

*et al.*, Civil No. 2:94-CV-01031G (D. Utah, filed October 21, 1994).

44.  Brown, the Wellshire entities and others became the subjects of a federal

securities fraud investigation that resulted in the D.E. Brown Family Trust and the

Wrenhaven Trust being placed under direct federal court supervision in early 1995, *see*

*United States vs. Douglas E. Brown, et al.*, Civil No. 2:95-CV-237G (D. Utah, filed

March 14, 1995).  (*See* DX-6 (stipulation and order); DX-7 (asset inventory).)

45.  The Wellshire entities' activities became the subject of a federal criminal

Indictment returned on December 13, 1995, against several defendants, including

Douglas Brown in *United States vs. Douglas E. Brown, et al.,* Case No. 2:95-CR-245B

(D. Utah).  (Tr. 4/26/11pm, at 368:10-371:9; *see* PX-58 (Superseding Indictment).)

46.  In May of 1995, the Trust had also purchased 65 shares of Top Knot, Inc.

stock for $1,000, also after Mr. Tingey consulted with Douglas Brown.  (Tr. 4/26/11pm,

at 360:25-361:19 (testimony of Robert Tingey).)  Top Knot, Inc. appears to have no

connection to the Wellshire entities. Tingey recalled that Top Knot was affiliated with a

company "that Brighton Factor Dealers was purchasing receivables from."  (*Id.* at 361:20-

362:3.)

### E.  The Brighton Factor Dealers Business

47.  Brighton Factor Dealers was a business operated by Douglas Brown from his

home with assistance from his sister, Lisa Mollerup. The Brighton Factor Dealers bank account was funded by the Browns through a transfer of $57,500 from the Browns' Canadian Union Securities account, $45,000 from The Trust's Wells Fargo account, as well as a $25,000 loan from Mr. Brown.[21] (*See* PX-34, PX-36, PX-40, PX-60, DX-2, DX-3.)

48. According to Mr. Tingey, "The Brighton Factor Dealers was a dba of the Trust," (Tr. 4/26/11pm, at 340:22-23); "It was a dba established -- I established for the D.E. Brown Family Trust. And it bought receivables and then collected them." (*Id.* at 346:4-16; *see* DX-2.)

49. As Mr. Brown explained, Brighton Factor Dealers "was really just a facilitation of the business where I was working. They would advance money on shipped products, accounts receivable, and then collect the money as those clients paid." (Tr. 4/25/11pm, at 193:8-11; *see also id.* at 192:8-193:5.)

50. Mr. Tingey testified that "Doug's sister Lisa, I believe, was an employee of Brighton Factor Dealers," and that "Lisa was sort of the administrator." (Tr. 4/26/11pm, at 349:20-350:4.) According to Mr. Tingey, Douglas Brown "was doing a lot of the leg work for it," and that Tingey himself "just monitored its bank account." (*Id.* at 349:25-350:12.)[22] Mr. Tingey testified that either he or Lisa Mollerup could sign checks drawn

---

[21](*See* Tr. 4/26/11pm, at 346:12-347:15; *see* DX-2.)

[22]Tingey testified that he "would review the bank statements that came through and (continued...)

on the Brighton Factor Dealers account.  (*Id.* at 364:22-365:8.)

51.  Brighton Factor Dealers generated revenue which according to Tingey "would have either been plowed back into the enterprise or used by the Trust for Trust purposes." (*Id.* at 350:17-23.)

52.  As a routine matter, Tingey would forward copies of Brighton Factor Dealers' bank account statements to Douglas Brown.  (*Id.* at 379:15-18.)  The same was true of bank account statements for the Trust's accounts.  (*Id.* at 380:15-19, 382:10-13; *see* PX-43.)

### F.  Douglas Brown and the D.E. Brown Family Trust

53.  Mr. Tingey described Douglas Brown's role in management of the Trust:

> Doug would -- I would consult with Doug when I made decisions. There were some times when he would bring opportunities to me, and I would consult with him about those opportunities before I made decisions. And then, as we've already discussed, he was sort of the leg man for the Brighton Factor Dealers operation.

(*Id.* at 383:21-25.)   From the evidence in the record, such consultation was a frequent occurrence.[23]

54.  As Mr. Tingey explained, Douglas Brown

---

[22](...continued)
had some working understanding of monies coming and going. But on a day-to-day basis, [Lisa Mollerup] pretty much ran the show."  (Tr. 4/26/11pm, at 413:22-25.)

[23]Tingey's billable time records from September 1992 through May of 1995 (DX-1), reflect over one hundred instances of correspondence or other communications with Douglas Brown.

had a better understanding than I did of that industry. He -- and I thought that was my duty, as trustee, to consult with people who understood the business. Plus, he had a vested interest in the beneficiaries and, therefore, in preserving and even growing the value of the assets of the Trust.

(*Id.* at 414:8-13.)

55. As to the shares held or purchased by the Trust from or in connection with the

Wellshire securities entities, Tingey testified that

I think in each case, Doug would have probably presented me with the opportunity, and then we would have discussed it. And I would have decided that it was a good thing to do. And in terms of who actually put the paperwork together, I don't remember.

(*Id.* at 433:12-17.)[24]

56. In September of 1998, the Trust entered into a stipulation by which it

relinquished the proceeds of the sale of the ALPNET shares ($196,359.70) and the

Surgical Technologies shares ($225,896.00) to the United States as restitution to be paid

to investors in Wellshire Services in connection with Douglas Brown's criminal

proceeding, *United States vs. Douglas E. Brown, et al.,* Case No. 2:95-CR-245B (D.

Utah). (*Id.* at 409:18-410:24; *see* PX-55 (stipulation), PX-56.)

57. As a direct consequence of the trustee's reliance upon Douglas Brown's

understanding of the investment industry and the "opportunities" that Brown had

presented to the Trust—and in which Mr. Tingey had invested Trust assets in reliance on

---

[24]The various cash and stock transactions conducted by Mr. Brown and Mr. Tingey using the Trust and accounts maintained in the name of the Trust or Brighton Factor Dealers are graphically depicted by the United States' demonstrative exhibit, PX-77.

Brown's advice and counsel—and as a direct consequence of Douglas Brown's involvement in criminal conduct during his employment at Wellshire, most of the Trust's assets were ultimately relinquished to the United States and their value lost to the beneficiaries of the Trust.[25]

58. With the assent of the trustee, Douglas Brown made use of the D.E. Brown Family Trust and its several bank and brokerage accounts to engage in financial transactions that were largely an extension of his own personal dealings and financial affairs involving the business of the Wellshire entities, and otherwise. Beginning in or about October 1994, Brown conducted the business of Brighton Factor Dealers through the Trust's accounts in an attempt to shelter that economic activity from Brown's mounting potential personal civil liability arising out of the Wellshire entities' business.

---

[25]The Brighton Ski Cabin remained on the Trust's books because it was not considered to be related to the Wellshire entities' criminal conduct involving Douglas Brown. (*See* Tr. 4/26/11am, at 224:15-17.)

## ANALYSIS

## I. RESULTING TRUSTS, NOMINEES AND THE BRIGHTON SKI CABIN PURCHASE[26]

### A. Federal Tax Liens and the Taxpayers' "Property"

Under the Internal Revenue Code, the IRS may satisfy a tax deficiency by imposing a lien on any "property" or "rights to property" belonging to the taxpayer. *Drye v. United States*, 528 U.S. 49, 55 (1999) (quoting 26 U.S.C. § 6321). The statutory language "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *Id.* at 56 (internal quotation marks omitted). The terms "property" and "rights to property" may thus include "not only property and rights to property owned by the taxpayer but also property held by a third party if it is determined that the third party is holding the property as a nominee . . . of the delinquent taxpayer." *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005).[27]

> The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had "property" or "rights to property" to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that "in application of a federal revenue act,

---

[26]Additional findings of fact (including findings of ultimate fact) as well as this court's conclusions of law are incorporated hereinafter as part of this Memorandum Opinion. *See* Fed. R. Civ. P 52(a)(1) ("The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court.").

[27]*See, e.g., Macklin v. United States*, 300 F.3d 814, 818 n. 2 (7th Cir. 2002) ("In the case of a nominee lien, the IRS proceeds 'against an alter ego or nominee of a delinquent taxpayer for purposes of satisfying the taxpayer's obligations.'") (quoting *United States v. Letscher*, 83 F. Supp. 2d 367, 375 (S.D.N.Y. 1999)).

state law controls in determining the nature of the legal interest which the taxpayer had in the property . . . sought to be reached by the statute."

*Aquilino v. United States*, 363 U.S. 509, 512-13 (1960) (quoting *Morgan v. Commissioner*, 309 U.S. 78, 82 (1940)).

The United States asserts its entitlement to a judgment that Douglas and Barbara Brown were the beneficial owners of 100% of the Brighton Ski Cabin property at the time that the pertinent federal tax liens attached to the Browns' property. The United States contends that under Utah law, the Browns' actions in purchasing the cabin property created a resulting trust in which they retained a beneficial interest, and that the D.E. Brown Family Trust merely served as the Browns' nominee in holding any interest in the title to the cabin or its purchase. The defendants respond that Douglas Brown made a bona fide gift of the cabin property to the Trust as a legitimate estate planning tool, without intending to shield the property from his own tax liabilities which had not yet accrued. They insist that although the trustee made some mistakes, he lived up to his fiduciary duty to protect the Trust's assets for the benefit of the beneficiaries, and the Trust, not the Browns, held the beneficial interest in the cabin property.

This court has some prior experience with claims of nominee liens.

In *Holman vs. United States*, Civil No. 1:02-CV-77J (D. Utah, filed June 13, 2002), a delinquent federal taxpayer named Kenneth Holman[28] resided with his wife

---

[28]The federal tax lien arose out of assessments against Mr. Holman for unpaid
(continued...)

Donna in a home previously owned by Mr. and Mrs. Smith. In 1991, the Holmans had agreed to buy the Smiths' residence, and the Smiths executed a warranty deed transferring title solely to Donna Holman. The Smiths and Donna Holman also executed a trust deed that identified Mrs. Holman as the trustor and the Smiths as beneficiaries. Upon discovering this trust deed, the Smiths' mortgage company invoked a due-on-sale clause, requiring the refinancing of the purchase of the home. With Mr. Smith as a cosignor, Donna Holman obtained a new mortgage loan, and on October 25, 1993, Donna Holman transferred the property by quitclaim deed to herself and Mr. Smith as tenants in common, and then she and Mr. Smith jointly executed a trust deed in favor of Donna Holman's mortgage company to secure the new loan. Kenneth Holman continued to reside with his wife and loan payments were largely made from his income. In 2002, the United States filed a tax lien on the Holman residence based upon the $820,833.85 tax liability then assessed against Kenneth Holman. Donna Holman brought an action to quiet title in the home free of the federal tax lien against her husband.

The United States claimed that both Mr. Smith and Donna Holman held title to the property as Mr. Holman's nominees, and that the property was therefore subject to Mr. Holman's federal tax lien. Following a bench trial on the issue, and based in part upon a stipulation by Mr. Smith and the Government, this court concluded that Mr. Smith held

---

[28](...continued)
employment taxes, not from the Holmans' joint income tax liability.

his property interest in the Holman residence solely as Mr. Holman's nominee, but that

Mrs. Holman did *not*, instead holding her interest in their home in her own right as part of

her marital estate.[29]  This court found that "Mr. and Mrs. Holman own the subject

property as tenants in common each with an undivided one-half interest in the whole."

*Holman v. United States*, Civil No. 1:02-CV-77J, 2005 WL 234998, at *4 (D. Utah,

decided January 28, 2005).  Thus, Kenneth Holman's one-half interest in the Holman

residence—held in the name of his nominee, Mr. Smith—was vulnerable to his own

federal tax lien, but Donna Holman's one-half interest was not.  *Id.*[30]

On appeal, the Tenth Circuit vacated and remanded for further proceedings in

which "the district court should first apply Utah law to determine whether Mr. Holman

has an interest in the Centerville house," and if so, "then determine whether the lien

---

[29]As this court explained, "Mrs. Holman could hold property in her name even if payments on that property were made by her husband by way of gift, or in consideration of love and affection, or by way of his legal duty of support." *Holman v. United States*, Civil No. 1:02-CV-77J, 2005 WL 234998, at *4 (D. Utah, decided January 28, 2005). This court also noted that Donna Holman's interest in the residence had not been transferred to her by her husband; the Smiths had conveyed the property to her as part of the Holmans' 1991 joint agreement to purchase the Smiths' residence. *Cf. United States v. Reed*, 168 F. Supp. 2d 1266, 1269 (D. Utah 2001) (Sam, J.) (that "the taxpayer placed the property in the nominee's name in anticipation of a liability or lawsuit" supports a finding of nominee status); *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 347, 350-51 (1977) (holding that luxury or vintage model automobiles transferred by a delinquent taxpayer to a nominee corporation remained subject to the collection of the taxpayer's tax liability).

[30]This court noted that "[w]here a taxpayer and wife held property as tenants in common, [a] federal tax lien could be enforced by sale of property and retention by government of only that portion of proceeds attributable to taxpayer's interest." 2005 WL 234998, at *4 n.5 (citing *United States v. Kocher*, 329 F. Supp. 1079 (S.D.N.Y. 1971)).

should be enforced under the standards set forth in the federal case law" dealing with lienable interests. *Holman v. United States*, 505 F.3d 1060, 1070 (10th Cir. 2007).

> "We look initially to state law to determine what rights the taxpayer has in the property the [IRS] seeks to reach." If the court concludes that the taxpayer has a property interest under state law, then "federal law . . . determine[s] whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of federal tax lien legislation."

*Id.* at 1067 (quoting *Drye v. United States*, 528 U.S. 49, 58 (1999)). *Holman* thus instructs that first, a showing must be made under state law that a delinquent taxpayer holds an interest in property that is at least nominally owned or held by another; the district court should then determine as a matter of federal law whether the nominee lien should be enforced, in light of the factors set forth in the federal case law. *Id.* at 1068; *see also Spotts*, 429 F.3d at 251 (stating that "before determining what, if any, federal tax consequences attach, we must first address the pertinent questions of state property law").

*Holman* offers some guidance as to possible state-law property interests, pointing to the Utah law of resulting trusts:

> Utah's case law indicates that a party may hold legal title in trust for a beneficial owner. *See Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 598–600 (Utah 1983) (discussing the doctrine of resulting trusts under Utah law); *see also McGavin v. Segal (In re McGavin)*, 189 F.3d 1215, 1217–19 (10th Cir. 1999) (discussing and applying the doctrine of resulting trusts under Utah law); *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1341 (10th Cir. 1998) (same).

*Id.* at 1068 (following *Spotts*, 429 F.3d at 252-54 (citing to Kentucky case law on "constructive trusts")).

Following *Holman*'s lead, the United States contends that "the Browns held an ownership interest" in the Brighton Ski Cabin "pursuant to a purchase money resulting trust." (Transcript of Trial, dated April 27, 2011 ("Tr. 4/27/11"), at 445:4-5 (Ms. Lowe).)

> The fact that must be proven in the case of a purchase money resulting trust is that one party paid the purchase price for property and another party was given legal title. The testimony and documents show that the Browns paid the purchase price for the cabin, although it was titled in the name of their trust.

(*Id.* at 445:10-15.)

### B. The Utah Law of Resulting Trusts

"The resulting trust is a kind of implied-in-fact trust, that is to say, it is imposed because as a matter of circumstantial evidence some such arrangement seems to have been intended by the parties, though they did not express their intent in words." Dan B. Dobbs, *Handbook on the Law of Remedies* § 4.3, at 241 (1973). A resulting trust may arise upon "the payment of the purchase price of property by one who directs that title be taken in the name of another." *Belton v. Buesing*, 240 Or. 399, 402 P.2d 98, 101 n.4 (1965). In determining whether a resulting trust arises under Utah law, courts generally look to the intention of the parties at the time of the transfer. *McGavin v. Segal (In re McGavin)*, 189 F.3d 1215, 1217-18 (10th Cir. 1999).

Under Utah law, when title to real property is taken in one person's name but the purchase price is paid by another, the general presumption is that a resulting trust is created, with the person paying the purchase price obtaining a beneficial interest in the

property:

> The general rule for the creation of a purchase money resulting trust by operation of law has been set out in *Restatement (Second) of Trusts* § 440 (1959):

>> Where a transfer of properties is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid, except as stated in §§ 441, 442 and 444.

> A similar formulation of this doctrine has been adopted in Utah, *Hawkins v. Perry*, 123 Utah 16, 253 P.2d 372 (1953), and we have previously cited with approval § 440 of the *Restatement (Second) of Trusts*. *Little v. Alder*, 19 Utah 2d 163, 428 P.2d 156 (1967). The fact which must be proven in the case of a purchase money resulting trust is that one party paid the purchase price for property and another party was given legal title.

*Matter of Hock's Estate*, 655 P.2d 1111, 1115 (Utah 1982). Such "a purchase money resulting trust is an equitable remedy designed to implement what the law assumes to be the intentions of the putative trustor." *Id.* at 1114 (citing 5 Austin W. Scott, *Law of Trusts* § 440.1 (3d ed. 1967)).[31]

The rule of *Restatement (Second) of Trusts* § 440 does have an exception:

Sections 442 and 443 of *Restatement (Second) of Trusts* provide that if the

---

[31]As Professor Scott explains,

If there's no evidence as to the intention of the parties, other than the fact that A paid the purchase price for conveyance to B, a resulting trust arises in favor of A. It is unnecessary for A to introduce further evidence that the trust was intended, since the character of the transaction itself raises the inference that B was not to take the property beneficially.

5 Austin W. Scott, *Law of Trusts* § 440 (3d ed. 1967).

transfer of property is made to one person, the purchase price is paid by another, and the transferee is a "wife, child or other natural object of bounty of the person by whom the purchase price is paid," a purchase money resulting trust will not arise unless the one paying the purchase price manifests an intention that the transferee should not have the beneficial interest in the property.

*Matter of Hock's Estate*, 655 P.2d at 1116.[32]  Indeed, "Where the parties involved are husband and wife, this presumption shifts and it becomes the burden of the party asserting the resulting trust to prove by clear and convincing evidence that such a trust exists." *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336 (10th Cir.), *cert. denied*, 525 U.S. 873 (1998); *see also Parks v. Zions First National Bank*, 673 P.2d 590, 598-99 (Utah 1983) (acknowledging that § 442 "is commonly applied under circumstances as herein presented (i.e., where a husband pays the purchase price for real property and places the title thereto in either his wife's name solely, or in both his and his wife's name jointly)" (footnotes omitted)); *id.* at 607 (Howe, J. dissenting) ("The rule stated in Section 442 that a donative intent is presumed has universally been followed by the courts in the country, both prior

---

[32]The court in *Hock's Estate* further noted that

[w]e have said that the presumption of a resulting trust arises in favor of a wife where her separate funds are used to purchase property and title is taken in the name of the husband.  *No such presumption arises if the husband's funds are used to purchase property to which the wife holds legal title*. . . .

*Id.* at 1116 n.2 (emphasis added).

to and since the promulgation of the *Restatement of Trusts*.").[33]

Section 443 of the *Restatement (Second) of Trusts* states a proposition converse to

that of § 442:

> Where a transfer of property is made to one person and the purchase price is
> paid by another, and the transferee is a wife, child or other natural object of
> bounty of the person by whom the purchase price is paid, and the latter
> manifests an intention that the transferee should not have the beneficial
> interest in the property, a resulting trust arises.

*Restatement (Second) of Trusts* § 443. Comment a to § 443 elaborates upon the question

of relevant evidence of the payor's intention:

> *a. Admissibility of parol evidence to rebut the inference of a gift.*
> Where one person pays the purchase price for property which is transferred
> at his direction to another who is a natural object of his bounty, parol
> evidence is admissible to show that the payor intended that the transferee
> should not have the beneficial interest in the property, even though the

---

[33]Given the Utah Supreme Court's articulation of the law of purchase money
resulting trusts, it seems plainly apparent that this court's findings in *Holman* conformed
to the applicable Utah law in the first instance: *no* resulting trust was to be presumed
where the Holmans agreed to buy the Smiths' property using Kenneth Holman's funds
but the Smiths' warranty deed conveyed title solely to his wife, Donna Holman; in
contrast, a resulting trust *was* to be presumed where Donna Holman quitclaimed an
undivided one-half interest in the property to Mr. Smith as part of the refinancing of the
purchase, where Mr. Smith testified he claimed no interest in the property and the loan
payments were ultimately to be made using Kenneth Holman's funds.

Even the direct evidence of Kenneth Holman's control and use of their residence
after 1993 was consistent with his own beneficial interest in the undivided one-half
interest that this court found was held by his nominee, Mr. Smith, and did not serve to
prove by clear and convincing evidence that Donna Holman's one-half interest in her
home was in fact a resulting trust in which she had *no* beneficial interest.

As it happened, following remand the United States ultimately entered a
satisfaction of judgment as to Kenneth Holman's delinquent tax liability and stipulated
with Donna Holman that the quiet title action be dismissed.

property transferred was an interest in land and the Statute of Frauds is in force. The intention of the payor not to make a gift to the transferee may be shown not only by oral declarations of his intention, but also by the circumstances under which the transfer is made. Thus, the fact that it would be improvident for the payor to make a gift to the transferee is an indication that he did not intend to make a gift. So also, the fact that the circumstances are such that the payor would have a reason for taking title in the name of another other than an intention to give him the beneficial interest is an indication that he did not intend to make a gift; as, for example, where the payor had reasons for wishing that it should not be known that he was purchasing the property.

It is the intention of the payor at the time of the transfer and not at some subsequent time which determines whether a resulting trust arises. . . . The conduct of the payor and of the transferee subsequent to the transfer, however, may be such as to show that at the time of the transfer the payor did not intend to make a gift to the transferee. Thus, *the fact that the payor manages the property, collects rents, pays taxes and insurance, pays for repairs and improvements, or otherwise asserts ownership, and the acquiescence by the transferee in such assertion of ownership, is evidence to rebut the inference of an intention by the payor to make a gift to the transferee.*

*Id.* § 443 cmt. a (emphasis added).

Whether the *Restatement (Second) of Agency* § 442 exception embraces Douglas Brown's transfer of property to a family trust of which his wife and children are beneficiaries, or conversely whether Brown has 'manifest[ed] an intention that the transferee [*viz.,* the Trust] should not have the beneficial interest in the property" within the meaning of § 443, must now be addressed.[34]

_____

[34]Defense counsel argued that the ownership of the cabin property should be resolved by application of the "merger doctrine," which stands for the proposition that "'[e]xecution and delivery of a deed by the seller then usually constitute full

(continued...)

### C. The Brighton Ski Cabin: Purchase Money Resulting Trust?

The United States starts with the proposition that under Utah law, "the fact that must be proven in the case of a purchase money resulting trust is that one party paid the purchase price for property and another party was given legal title," and asserts that "[t]he testimony and documents show that the Browns paid the purchase price for the cabin, although it was titled in the name of their trust." (Tr. 4/27/11, at 445:10-15 (Ms. Lowe).) The evidence establishes that Douglas and Barbara Brown initiated the purchase of the Brighton Ski Cabin by making an offer to Gilbert Jensen and tendering a $5,000 earnest

---

[34](...continued)
performance'" on the seller's part, and if accepted by the buyer, "the deed is the final agreement and all prior terms, whether written of verbal, are extinguished and unenforceable,'" even though "'the estate conveyed may differ from that promised in the entecedent agreement.'" *Maynard v. Wharton*, 912 P.2d 446, 449 (Utah Ct. App. 1996) (quoting *Stubbs v. Hemmert*, 567 P.2d 168, 169 (Utah 1977)).

But the question presented here is *not* whether the Jensen trusts' warranty deed conveying the Brighton Ski Cabin to the Trust is at variance with a prior agreement between the Browns and the Jensens. It is uncontroverted that legal title to the cabin property was conveyed to the Trust *as agreed* at the time of closing. The question here is whether the Trust holds that title in a resulting trust in favor of the payor, Douglas Brown. As explained above, a purchase money resulting trust is an equitable remedy, and

> as in most cases involving constructive or resulting trusts, we are called upon to alter a deed or other writing which is regular in form and is presumed to convey a clear and unambiguous title. When such a deed or document is attacked, the party alleging the variance must prove the claim by clear and convincing evidence. . . . Parol evidence may be introduced to prove a constructive or resulting trust since these trusts arise by operation of law and are expressly excluded from the statute of frauds.

*Matter of Hock's Estate*, 655 P.2d at 1114 (citations omitted). Thus, the deed alone does not resolve the question of an equitable remedy in this case.

money deposit using Douglas Brown's funds; the Jensens counter-offered and the Browns accepted. Again using his own funds, Mr. Brown purchased a $78,982.99 cashier's check which he tendered to Title West at the June 23, 1993 closing. The check was accepted as a down payment on the cabin property—together with a $200,000 trust deed note signed by Mr. Brown as obligor—all in consideration for the delivery of the Jensen trusts' warranty deed conveying the cabin property to the D.E. Brown Family Trust—an entity which Mr. Brown's brother Mark purportedly had created the previous day,[35] the beneficiaries of which are Barbara Brown and the Browns' children.

Thus, by the end of the day on June 23, 1993, it was plainly apparent that "one party paid the purchase price for property and another party was given legal title." *Matter of Hock's Estate*, 655 P.2d at 1115. Consistent with *Restatement (Second) of Trusts* § 440, Utah law might conclude that "a resulting trust arises in favor of the person by whom the purchase price is paid" in order to give effect to "what the law assumes to be the intentions of the putative trustor." *Id.* at 1114, 1115. But here, going no further than to presume the existence of a purchase money resulting trust solely from "the fact that must be proven" under § 440 fails to take into account the relationship among these

---

[35](*See* DX-1.) "An express trust is generally described as "a fiduciary relationship with respect to property,'" *Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 598 (Utah 1983) (quoting 5 Austin W. Scott, *The Law of Trusts* § 462.1 (1967)), and "the manifestation of a settlor's intent with regard to property," *Rawlings v. Rawlings*, 2010 UT 52, ¶ 26, 240 P.3d 754, 762. Here, when the Trust purportedly was created on June 22, 1993 the trustor/settlor, Mark Brown, contributed *no* assets and identified *no* property as being held subject to the Trust. *See infra* note 43.

parties.

   While the transferee of title in this case is not, strictly speaking, the "wife, child or other natural object of bounty of the person by whom the purchase price is paid," *Restatement (Second) of Trusts* § 442, the *named beneficiaries* of the D.E. Brown Family Trust fall precisely into that category, and the Trust would presumably hold the title to the Brighton Ski Cabin for their exclusive benefit.  As such, reason suggests that the § 442 exception should be applied to these facts in preference to the more general § 440 presumption as to transferees who are not members of the purchaser's immediate family. Applying *Restatement (Second) of Trusts* § 442 to the facts of this case as a matter of Utah law, the burden rests upon the United States to prove by clear and convincing evidence that Douglas Brown "manifest[ed] an intention that the transferee [Trust] should not have the beneficial interest in the property," and thus, that "a resulting trust arises" consistent with *Restatement (Second) of Trusts* § 443.

   The United States asserts that Douglas Brown transferred the cabin property to the Trust to protect the asset against his own then-accruing federal tax and other civil liabilities, and thus "had reasons for wishing that it should not be known that he was purchasing the property."  *Restatement (Second) of Trusts* § 443 cmt. a.  Moreover, the United States asserts that the conduct of the Browns and the Trust subsequent to the purchase of the cabin property support the inference that Douglas Brown did not actually intend to make a gift of the cabin property to the Trust.  The Browns—not the Trust or its

trustee—took possession of the cabin immediately after the purchase[36] and consistently exercised control over the property, using the cabin as they pleased. As Barbara Brown testified, the Browns used the cabin "[o]ccasionally. Sometimes -- a few times in the summer. A few times in the winter." (Tr. 4/26/11am, at 301:7-8.)

> Q Would the whole family go up each time that you used the cabin?
>
> A Not all the time. Later on my kids would go skiing and they would go into the cabin, get warm, go to the bathroom.

(*Id.* at 301:9-12.) Douglas Brown testified that his family would use the cabin sometimes for long weekends, sometimes for day trips, and that they would invite friends or business associates to the cabin. (*Id.* at 246:18-247:13.) And they did so without supervision by or the permission of the Trust or its trustee:

> Q Each time you went to the cabin with your family or with friends or business colleagues, you didn't call Mr. Tingey and ask permission to go up there, did you?
>
> A Not each time, no.

(*Id.* at 247:14-17.)

> Mrs. Brown testified that she paid the cabin's utility bills:

---

[36]As Douglas Brown testified:

> Q Let's talk a little bit about the cabin itself and how it was used. You and your family began using it immediately after purchase; is that right?
>
> A Yes.

(Tr. 4/26/11am, at 246:6-9.)

Q Now did you pay the electric bills -- the utility bills for the cabin?

A Yes.

Q At one time -- and that was during the whole time period that you owned the cabin?

A As far as I remember, yes.

Q At one time did you pay for a telephone at the cabin?

A I had a telephone up there -- there was a telephone up there that I paid, but got rid of it.

(*Id.* at 302:1-9.)[37]

She also testified that sometimes the Browns had paid the insurance premiums on the cabin. (*Id.* at 302:10-12.) Mr. Brown testified that both the Browns and the Trust paid the insurance at times, but that the insurance policy was issued in his name. (*Id.* at 248:10-249:13; *see* PX-33.) The trustee testified that the insurance premiums were paid "initially because I paid some premiums."

And I understood that it was after that. But there was a point in time where

---

[37]In contrast, the trustee testified:

Q. The Trust was also responsible for paying the utilities on the cabin. Isn't that true?

A. It would probably technically be true.

Q. But it actually didn't pay them?

A. Correct.

(Tr. 4/26/11pm, at 335:6-10 (testimony of Robert Tingey).)

-42-

I did not pay the premiums anymore out of the Trust.

Q. In fact, the Browns took over paying those premiums, correct?

A. I think so, but I don't know for sure.

(Tr. 4/26/11pm, at 332:10-16.)

The Browns also performed maintenance work at the cabin, *e.g.*, every few years, the Browns would stain the exterior wood on the cabin. (Tr. 4/26/11am, at 248:3-7 (testimony of Douglas Brown).)

Besides enjoying the cabin property themselves, an occasion arose in or about October 2005 in which Mr. Brown rented the cabin to a friend, Charles Jorgensen, who "stayed up at the cabin quite a bit during that period of time," and who made the October 2005 note payment to the Jensens at Mr. Brown's direction, followed by four more quarterly payments through October 2006—all without the knowledge or permission of the trustee, Mr. Tingey. (*Id.* at 256:19-257:19; Tr. 4/26/11pm, at 331:9-11 (testimony of Robert Tingey); PX-21.) Indeed, Mr. Tingey knew little or nothing about how the Browns used the Brighton Ski Cabin,[38] and did nothing to maintain the property:

Q. Now, it's true that the Trust was technically in charge of maintenance for the cabin, correct?

A. That's probably correct.

Q. But you, yourself, never performed any maintenance on the cabin. Isn't that true?

---

[38](*See id.* at 331:1-11.)

A. It's true, and it's a good thing.

Q. And you never delegated that responsibility to anyone?

A. That's true.

(*Id.* at 331:12-20.)

This and other evidence in the record effectively rebuts § 442's implicit inference that Douglas Brown intended to make a bona fide gift of the Brighton Ski Cabin to the Trust solely for the benefit of his wife and children. To the contrary, the conduct of the Browns and of the Trust subsequent to the 1993 purchase was "such as to show that at the time of the transfer the payor did not intend to make a gift to the transferee." *Restatement (Second) of Trusts* § 443 cmt. a. The Browns effectively managed the property, paid utilities and insurance as well as making repairs and improvements—even renting the cabin to a third party on at least one occasion—and otherwise asserted their ownership and control of the cabin. Given the acquiescence by the trustee in the Browns' effective assertion of ownership,[39] the Browns' conduct serves "to rebut the inference of an intention by the payor to make a gift to the transferee." *Id.* Douglas Brown ignored the

_____

[39]"A trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of beneficiaries." *Continental Bank & Trust Co. v. Country Club Mobile Estates, Ltd.*, 632 P.2d 869, 872 (Utah 1981) (citing *Restatement (Second) of Trusts* § 2 (1959)). "It is therefore axiomatic in trust law that the trustee . . . has exclusive control of the trust property, subject only to the limitations imposed by law or the trust instrument." *Id.* Here, the Browns—not Mr. Tingey as trustee—exercised exclusive control of the cabin property for more than fifteen years.
"This is a case where a settlor created a trust and then chose to ignore it." *Id.*

-44-

formalities of the Trust at least as often as he observed them in making payments for, using, and even renting out the cabin property to another, and he treated the property formally deeded to the Trust as if it was his own, to do with as he pleased. Brown remained a co-obligor on the trust deed note, and at all times remained the sole record owner of the one share of water stock then appurtenant to the cabin property.

Applying the pertinent Utah law standards, this court concludes that Douglas Brown manifested an intention that the D.E. Brown Family Trust should not hold the actual beneficial interest in the Brighton Ski Cabin property, and thus a purchase money resulting trust had arisen in favor of Douglas Brown at and after the time of the 1993 purchase. As a consequence of that purchase money resulting trust, the Browns, not the D.E. Brown Family Trust, held the beneficial interest in the Brighton Ski Cabin property.

### D.  The Government's Nominee Tax Lien Theory

"A nominee is one who holds bare legal title to property for the benefit of another." *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir.), *cert. denied*, 534 U.S. 953 (2001). When a taxpayer's "property" or "rights to property" are held in the name of another, or are transferred to another with the taxpayer retaining beneficial ownership, the third party is said to be a "nominee" for the taxpayer. W. Elliott, *Federal Tax Collections, Liens, and Levies* ¶ 9.10[1] (2d ed. 2003); *see* S.R. Mather and P.H. Weisman, *Federal Tax Collection Procedure*, Tax Management Portfolio (BNA) No. 638-2nd, at A-105 to A-106 (2000). At this point, it appears well settled that property

held by a taxpayer's nominee or alter ego may be subjected to a federal tax lien or levy.

*See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-351 (1977) (taxpayer's

corporate alter ego); *Scoville v. United States*, 250 F.3d at 1201 (ex-wife held farm as ex-

husband's nominee); *Richards v. United States (In re Richards)*, 231 B.R. 571, 578 (E D.

Pa. 1999) (trust was taxpayer's nominee); *United States v. Klimek*, 952 F. Supp. 1100,

1113 (E.D. Pa. 1997) (corporations were taxpayer's nominees).

As the Tenth Circuit explained in *Holman*:

> The nominee theory focuses upon the taxpayer's relationship to a
> particular piece of property. *Oxford Capital Corp. v. United States*, 211
> F.3d 280, 284 (5th Cir. 2000). The ultimate inquiry is whether the taxpayer
> has engaged in a legal fiction by placing legal title to property in the hands
> of a third party while actually retaining some or all of the benefits of true
> ownership.

*Holman*, 505 F.3d at 1065.[40] The "nominee theory involves the determination of the true

beneficial or equitable ownership of the property" at issue. *Oxford Capital Corp. v.*

*United States*, 211 F.3d at 284.

---

[40]*See also In re Richards*, 231 B.R. at 578:

> Focusing on the relationship between the taxpayer and the property, the
> [nominee] theory attempts to discern whether a taxpayer has engaged in a
> sort of legal fiction, for federal tax purposes, by placing legal title to
> property in the hands of another while, in actuality, retaining all or some of
> the benefits of being the true owner. Said another way, the nominee theory
> is utilized to determine whether property should be construed as belonging
> to the taxpayer if he/she treated and viewed the property as his/her own, in
> spite of the legal machinations employed to distinguish legal title to the
> property.

"Many courts use six factors in evaluating nominee questions: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property."

*Holman.* at 1065 n.1 (quoting *Spotts*, 429 F.3d at 253 n.2); *Towe Antique Ford Foundation v. IRS*, 791 F. Supp. 1450, 1454 (D. Mont. 1992) (listing same nominee factors), *aff'd*, 999 F.2d 1387 (9th Cir. 1993); *see also In re Richards*, 231 B.R. at 579 (citing *United States v. Klimek*, 952 F. Supp. 1100, 1113 (E.D. Pa. 1997) (listing nominee factors)).[41]

Not all of the foregoing nominee factors are of equal weight, and they "should not

---

[41] A similar list of factors was enumerated in *United States v. Reed*, 168 F. Supp. 2d 1266, 1268-1269 (D. Utah 2001) (Sam, J.):

The courts consider the following factors as support for finding nominee status: (1) the taxpayer exercises dominion and control over the property while the property is in the nominee's name; (2) the nominee paid little or no consideration for the property; (3) the taxpayer placed the property in the nominee's name in anticipation of a liability or lawsuit; (4) a close relationship exists between the taxpayer and the nominee; and (5) the taxpayer continues to enjoy the benefits of the property while the property is in the nominee's name.

*See also United States v. Marsh*, 114 F. Supp. 2d 1036, 1043 (D. Hawaii 2000) (listing factors); *Porta-John of America, Inc. v. United States*, 4 F. Supp. 2d 688, 701 (E.D. Mich. 1998); *United States v. Olson*, Case No. 98-C-2170, 2002 WL 575744 (N.D. Ill. 2002) (citing *Shades Ridge Holding Co., Inc. v. United States*, 888 F.2d 725, 729 (11th Cir. 1989)); *Libutti v. United States*, 107 F.3d 110, 120 (2d Cir. 1997); *United States v. Bannister*, Case No. 02-C-075 S, 2002 WL 31360657 at * 2 (W.D. Wis. 2002).

be applied rigidly or mechanically, as no one factor is determinative." *In re Richards*, 231 B.R. at 759. But one of the most significant factors for determining nominee status is whether the taxpayer can control the asset at issue either directly or indirectly. *See id.* ("the critical consideration is whether the taxpayer exercised active or substantial control over the property") (citing *United States v. Kudasik*, 21 F. Supp. 2d 501, 508 (W.D. Pa. 1998) (citing *Shades Ridge Holding Co., Inc. v. United States*, 888 F.2d 725, 728 (11th Cir. 1989) (stating that the critical factor in determining whether one is a nominee is whether the taxpayer "has 'active' or 'substantial' control."))); *United States v. Novotny*, Case No. 99-D-2196, 2001 WL 1673628 at * 3-4 (D. Colo., November 8, 2001) ("The critical issue is who has substantial control over the property." (citations omitted)); *cf. United States v. Miller Bros. Constr. Co.*, 505 F.2d 1031 (10th Cir. 1974) (United States permitted to foreclose lien against real property equitably owned by taxpayer; "the fact taxpayer exerted dominion and control over the land from 1952 until his death in 1971 is indicative of his ownership").

This court must now consider each of the *Holman* factors in light of the evidence presented at trial.

### (1) "[W]hether inadequate or no consideration was paid by the nominee"

At the outset, the D.E. Brown Family Trust itself paid *nothing* toward the purchase of the Brighton Ski Cabin property. The $5,000 earnest money deposit was paid by Douglas Brown using his own funds, as was the $78,000 down payment; Douglas Brown,

not the Trust, purchased the $78,982.99 cashier's check that was tendered to Title West at the time of closing, and he did so using "money that I had from various sources." (Tr. 4/26/11am, at 226:19 (testimony of Mr. Brown).) The Browns insist that Douglas Brown "gifted" the $78,000 down payment to the Trust at the time of closing, but the cashier's check presented at closing was payable to Title West, not to the Trust or to Mr. Tingey as its trustee. Even if Douglas Brown intended to "gift" the down payment to the Trust, he failed to deliver the funds to the Trust, and Mr. Tingey had no opportunity to accept the gift on behalf of the Trust.[42]

The Browns also made the first two payments to the Jensen trusts pursuant to the $200,000 trust deed note. Mr. Tingey, as trustee of the Trust, did not pay anything towards the purchase of the cabin property using funds actually held by the Trust until April of 2004. (*See* PX-21.)

This is not surprising, given the fact that prior to the delivery of the Jensens' warranty deed conveying the cabin property to the Trust, the evidence reflects that the

---

[42](Tr. 4/26/11am, at 226:21-227:1.) "The elements of a valid gift are as follows: (1) an intention to give and surrender title to and dominion over the property, (2) delivery of the property to the donee, and (3) acceptance by the donee." 38 Am. Jur. 2d *Gifts* § 14 (2010) (footnote omitted); *see also Lovett v. Continental Bank & Trust Co.*, 4 Utah 2d 76, 78, 286 P.2d 1065, 1066 (1955) ("It is elementary that an irrevocable delivery with the intention to pass immediate ownership is a necessary requisite of a completed gift.")

How simple it would have been for Mr. Brown to observe the formalities of the Trust and "gift" $78,000 to the Trust by *actually transferring it to the Trust*. But Mr. Brown failed to do so, and he proceeded to execute many of the closing documents in his own name as purchaser of the cabin property. The name of the Trust was then added to some, but not all of those documents, both at the closing and nearly a month later.

Trust itself had *no* assets of its own. Mark Brown, trustor of the Trust, contributed

nothing to the Trust at the time he purportedly created it.[43]  Neither Douglas nor Barbara

Brown had actually contributed any money or property to the Trust by the time of the

June 23, 1993 closing on the cabin property.  Thereafter, the Browns made the initial

quarterly payments on the cabin themselves without transferring the funds to the Trust.  In

fact, Mr. Tingey did not open a checking account for the Trust until March 25, *1994*,

almost a year after the cabin purchase.[44]  Thereafter Mr. Brown transferred various shares

of stock to the Trust, some of which were sold and the proceeds retained in the Trust's

accounts, but subsequently a series of payments drawn upon the Wrenhaven Trust were

---

[43]It appears well settled under Utah law that an express trust is created "when a settlor, with intent to create a trust, transfers property to a trustee in trust for, or declares that he or she (the settlor) holds specific property in trust for, a named beneficiary." *Sundquist v. Sundquist*, 639 P.2d 181, 181-82 (Utah 1981) (citing *Restatement (Second) of Trusts* §§ 2, 17).  "To create an inter vivos trust, '[a] settlor must have an intent to create a presently enforceable trust, [and] the trust property must be clearly specified and set aside . . . .'"  *In re Estate of Flake*, 2003 UT 17, ¶ 11, 71 P.3d 589, 594 (quoting *Sundquist*); *see Bennion v. Hansen*, 699 P.2d 757, 759 (Utah 1985) ("Creation of a trust requires delivery of property into the trust."); *Leggroan v. Zion's Sav. Bank & Trust Co.*, 120 Utah 93, 232 P.2d 746, 748 (1951) ("[T]he test for determining whether a writing has effected a trust . . . is whether the maker intended . . . to transfer some present interest."); George G. Bogert & George T. Bogert, *Trusts & Trustees* § 998 (2d ed. rev. 1983) ("The creation of a trust involves the transfer of property interests in the trust subject-matter to the beneficiaries.").

Here, Mark Brown as the trustor of the D.E. Brown Family Trust neither transferred any property to the trustee, Robert Tingey, nor declared that he held specific property in trust for the named beneficiaries.  The D.E. Brown Family Trust Agreement references "the assets of the Trustor, described in Schedule 'A' attached hereto," which "shall constitute the trust estate and shall be held by the Trustee," but no Schedule "A" is attached to that Agreement.  (*See* DX-1, PX-30.)

[44](*See* Tr. 4/26/11am, at 260:2-8 (testimony of Douglas Brown).)

made by Mr. Tingey because at that time the D.E. Brown Family Trust had no money.[45]

Indeed, of the fifty-seven payments on the note that the Jensens had received from 1993 through 2007, only *twenty-five* came from Mr. Tingey drawn on funds held in the name of the D.E. Brown Family Trust. In contrast, *thirty-two* payments were made directly by the Browns using their own funds or funds held for their benefit (*e.g.*, the twelve payments made by the Wrenhaven Trust, another trust funded by Douglas Brown for which Mr. Tingey also served as trustee), or were made by third parties at Douglas Brown's direction (*e.g.*, "rent" payments due and payable from the Browns' tenant in the cabin, Mr. Jorgensen), or with whose business Mr. Brown was intimately involved (*e.g.,* the five payments made by Brighton Factor Dealers[46]), or that owed money to Douglas

---

[45]As Mr. Brown testified at trial:

Q . . . Why was the Wrenhaven Trust paying those payments?

A I believe it was paying those payments because the cash had been taken out of the D.E. Brown Family Trust, and that was the only source available to Mr. Tingey to make those payments.

(Tr. 4/26/11am, at 275:20-25.) Mr. Tingey testified that "I think there was a point in time where it may not have had anything in it, I think. So I used the Wrenhaven Trust because it had some cash in it." (Tr. 4/26/11pm, at 342:2-5.)

In December of 1998, as part of a settlement with the United States in connection with a forfeiture proceeding arising out of Mr. Brown's unlawful securities activities, the Trust relinquished nearly $400,000 in cash and securities that had been placed in the Trust by Mr. Brown, leaving the Trust's interest in the Brighton Ski Cabin as its sole remaining asset. (Tr. 4/26/11am, at 274:3-275:6 (testimony of Douglas Brown); *see* PX-55, PX-56.)

[46]*See* Findings of Fact, *supra*, ¶¶ 47-52. Mr. Tingey also testified that as to the
(continued...)

Brown personally (*e.g.*, salary payable to him by an employer, Sundance Homes).  (Tr. 4/26/11am, at 258:6-19; PX-21); *see* Findings of Fact, *supra*, at ¶¶ 17-19.

Even the twenty-five payments that were actually drawn by the trustee on the Trust's own accounts were indirectly paid by Douglas Brown because he was the only one who contributed assets to the Trust.  (*See* Tr. 4/25/11pm, at 174:19-175:1 (testimony of Douglas Brown); Tr. 4/26/11pm, at 335:16-21 (testimony of Robert Tingey).)

On paper at least, some consideration for the cabin purchase was in fact paid by the Trust, but the lion's share of the note payments made from 1993 through 2007 were made by Douglas Brown and Barbara Brown, using their own funds, or by third parties who acted at Mr. Brown's direction or under his control.

### (2)  "[W]hether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property"

This *Holman* factor may analytically be parsed into two distinct considerations: (a) whether Douglas Brown placed the Brighton Ski Cabin in the Trust in anticipation of incurring personal liability from which the property would thus be sheltered; and (b) whether the Browns remained in control of the Brighton Ski Cabin after it was transferred into the Trust—a consideration that at least overlaps the fifth and sixth *Holman* factors.

---

[46](...continued)
Brighton Factor Dealers payments, "I think at that point in time the Brighton Factor Dealers account was the only one that had any operating funds in it."  (Tr. 4/26/11pm, at 390:24-391:1.)

### (a) "anticipation of a lawsuit or other liability"

The United States insists that at the time Douglas Brown transacted the purchase of the Brighton Ski Cabin and transferred the same into the Trust in 1993, he knew that he was accruing significant income tax liabilities and potential civil liability for unlawful conduct involving securities for which he would subsequently be indicted. The Browns failed to file a tax return for 1993 until September 11, 1997, and then reported $349,926.00 in unpaid income tax. The defendants respond that in June of 1993, Douglas Brown did not know or have reason to know that he would accrue income tax liability for 1993 of the magnitude that he ultimately did when he finally filed a return for the 1993 tax year in September of 1997. In 1993, Brown ostensibly believed that taxes withheld from his income as well as estimated tax prepayments he made would more than cover his tax liability for the year. They also point out that civil and criminal liability for Brown's securities activities in 1993 did not come home to roost until two years later.

Mr. Tingey testified that he understood that Douglas Brown wanted to create the Trust in part "to set up an entity that would hold some assets separate and apart from him" to protect his assets from creditors. (Tr. 4/26/11pm, at 317:15-22 (testimony of Robert Tingey).) Sheltering personal assets from the lawful claims of creditors is an intention distinguishable in its purpose from the donative intent to transfer assets to a trust entirely for the benefit of others; one need not seek to *protect* personal assets from creditors if one is in fact giving them away without retaining any beneficial interest that a creditor may

lawfully reach.

Moreover, Mr. Brown subsequently parked shares of stock in the Trust's accounts as well as the proceeds of sale of some of those shares, and operated a personal business venture, Brighton Factor Dealers, using the Trust's accounts—account activity wholly controlled by Mr. Brown for which the trustee, Mr. Tingey, afforded Brown free rein. These activities reflect an intention to shelter personal investment activity that is readily distinguishable from a donative intent to "gift" assets to the Trust solely for the benefit of its beneficiaries.

### (b) whether "the transferor remains in control of the property"

At the outset, Douglas Brown pursued the purchase of the Brighton Ski Cabin in 1993 "to be held as an investment and, yes, we thought we would probably be able to use it also."[47] Following the June 23, 1993 closing on its purchase, Mr. Brown and his family obtained and exercised dominion and control over the cabin property, and they continued to exercise that dominion and control for the duration of the Trust's "ownership" of the cabin.

Moreover, from 1993 on, Douglas Brown was and remained the sole owner of the Silver Lake water company share that Mr. Jensen had transferred to him for the use and benefit of the Brighton Ski Cabin, thus ensuring that the cabin had a culinary water supply. Mr. Brown never made any effort to transfer the water share to the Trust or have

---

[47](Tr. 4/26/11am, at 226:6-7 (testimony of Douglas Brown).)

the certificate reissued in the name of the trustee.[48]

In contrast, Mr. Tingey, trustee of the D.E. Brown Family Trust, did not exercise direct control over the cabin property or the Browns' access to and use of the property and took no steps to maintain the property. Nor did he have personal knowledge of (1) how often the Browns visited cabin; (2) the duration of their visits; and (3) whether the Browns invited guests to stay at the cabin or even rented out the cabin to others. In fact, Mr. Tingey never attempted to inquire into these matters.

### (3) "[W]hether there is a close relationship between the nominee and the transferor"

The relationship between the D.E. Brown Family Trust and Douglas and Barbara Brown is undeniably close. The trustor of the Trust was Douglas Brown's brother, Mark; Mr. Tingey, the trustee of the Trust, is Barbara Brown's brother-in-law;[49] and the beneficiaries of the trust are Barbara Brown and the Brown's four children.

### (4) "[W]hether they failed to record the conveyance"

The evidence in the record reflects that on or about June 22, 1993, just prior to the time of closing the sale, the Jensen trusts executed a warranty deed conveying their respective undivided one-half interests in the Brighton Ski Cabin property to Robert Tingey as trustee of the D.E. Brown Family Trust. *See* Findings of Fact ¶4; (PX-6). It

---

[48](*Id.* at 243:5-244:23, 246:2-5.) For his part, Mr. Tingey "was vaguely aware there was some kind of a water issue, but I'm not sure I ever really understood what it was." (Tr. 4/26/11pm, at 331:24-332:1 (testimony of Robert Tingey).)

[49](*See Tr.* 4/25/11pm, at 173:8-15 (testimony of Douglas Brown).)

appears that the warranty deed was duly recorded as entry number 5535850 in Book 6691, Page 1686 in the Salt Lake County Recorder's Office. (*See* Exhibit "E" to Defendant Robert Tingey's Memorandum in Opposition to United States' Motion for Summary Judgment, filed December 23, 2008 (dkt. no. 46).)

### (5) "[W]hether the transferor retained possession"

Having exercised nearly exclusive dominion and control over the Brighton Ski Cabin after its purchase in June 1993, the Browns "retained possession" of the property until the non-judicial foreclosure conducted by Mr. Brown's brother terminated the Browns' possession of the property in November of 2009.[50] During October 2005 and for the year or so that followed, the Browns' friend, Mr. Jorgensen moved into the cabin. He did do with the Browns' permission—without the knowledge or consent of the trustee, Mr. Tingey—and Jorgensen paid "rent" in the form of five quarterly payments sent directly to the Jensens, as Mr. Brown directed.

### (6) "[W]hether the transferor continues to enjoy the benefits of the transferred property"

Following its June 23, 1993 purchase, Douglas and Barbara Brown continued to enjoy essentially unfettered use of the Brighton Ski Cabin and used the cabin as if it were

---

[50]On November 20, 2009, James Brown conducted a trustee's sale of the Brighton Ski Cabin property. The property was sold to the highest bidder, James D. and Joell P. Brown, for the amount of $305,000.00. After subtracting the amount due pursuant to the trust deed note as well as various fees, there remained a surplus of $ 154,236.02, which sum has since been deposited into the Registry of this court. (*See* Order re: Deposit of Funds, filed August 18, 2011 (dkt. no. 135).)

their own. They generally visited the cabin at least six times per year, and they sometimes

took friends and business associates up to the cabin during these visits. During the winter,

the Brown family used the cabin more frequently because of its convenient location next

to the Brighton ski slopes; as the Brown children grew older, they would often use the

cabin while skiing at Brighton during the winter. The Trust, on the other hand, enjoyed

little or no benefit of the cabin property apart from the Browns' use. Mr. Tingey did not

supervise the use of the cabin and did not rent the cabin to other users to generate income

to the Trust, or otherwise.

### (7) Summary

In this case, the evidence shows that the Browns created the Trust to shield their

assets from their creditors and transferred the Brighton Ski Cabin to the Trust for that

purpose, all the while intending to use the Brighton Ski Cabin as their own property. The

trustee of the trust, Mr. Tingey, had little or no involvement in the matters surrounding

the cabin such as maintenance or the payment of the utilities and insurance. Douglas and

Barbara Brown enjoyed unlimited access to and use of the cabin property—indeed, all the

benefits of ownership of that property, paid for directly or indirectly using Douglas

Brown's funds.

> The United States has long argued that "[i]n sum,
>
> this case presents a quintessential example of nominee liability. Douglas
> and Barbara Brown arranged the purchase of the Brighton Ski Cabin at the
> same time they started incurring the federal income tax liabilities at issue in
> this matter, and they had the title to the cabin placed in the name of the trust

to shield their assets from their creditors.  The cabin was acquired with the Browns funds and they paid for the maintenance and insurance on the cabin.  Finally, they have continuously enjoyed unfettered access to and use of the cabin.  These facts establish that Douglas and Barbara Brown are the true beneficial owners of the Brighton Ski Cabin . . . .

(Memorandum in Support of United States' Motion for Summary Judgment, filed November 20, 2008 (dkt. no. 40), at 24.)

Other courts have reached the same conclusion based upon similar facts.  As the district court concluded in *In re Richards*,

Once having embarked upon a strategy to place the home in trust for their son, it was the Richards' obligation to maintain the formalities accompanying the establishment of a separate legal entity and to carry out their duties as co-trustees. Indeed, Mr. Richards, at least, was an experienced real estate broker, sophisticated enough to consider placing the Residence in a trust, to seek legal advice to accomplish this, and to make clear that the trust owned the Residence when applying for the home equity loans. Similar precautionary steps ought to have been taken after the transfer.  The Richards' unequivocal actions here speak louder than their assertions and are consistent with a determination that the Richards viewed and treated the home as their own.  That is, the Richards' relationship to the Residence was substantially the same before and after they established the trust in that they exercised active or substantial control over the property. Accordingly, this Court holds that the Bankruptcy Court properly determined that the trust held the Residence as the Richards' nominee.

231 B.R. at 580; *see also United States v. Marsh*, 114 F. Supp.2d 1036, 1043 (D. Hawaii 2000) (trust held to be taxpayer's nominee); *United States v. Schaut*, Case no. 97-C-4114, 2001 WL 1665314 (N.D. Ill., December 28, 2001).

"A trust will be considered the nominee of a taxpayer when the taxpayer 'maintain[s] an absolute position of authority over the affairs of the trust . . . [and there is

no] need to consult anyone else in making decisions for the Trust . . . .'" *The Colby B. Foundation v. United States*, Case No. Civ. 96–3073–CO, 1997 WL 1046002, at *20 (D. Ore., October 22, 1997) (quoting *United States v. Geissler*, 1993 WL 625535 at *8 (D. Idaho 1993)), *aff'd*, 166 F.3d 1217 (9th Cir. 1999) (Table).  The evidence demonstrates that such was the case here, with Douglas Brown exercising *de facto* control over the assets of the D.E. Brown Family Trust—particularly the Brighton Ski Cabin—from the Trust's creation in 1993 through the 2009 trust deed sale of the cabin property, the Trust's sole remaining asset of value.

Now, having the benefit of all of the evidence presented at trial,[51] this court concludes that the United States' view is correct, and that the balancing of the *Holman* nominee factors—foremost among them the fact that the Browns actively exercised exclusive control over the cabin property during the entire period it was titled to the Trust—supports the conclusion that the D.E. Brown Family Trust held title to the Brighton Ski Cabin as the nominee of Douglas and Barbara Brown.  If *Holman*'s "ultimate inquiry" is whether the Browns have "engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership," *Holman*, 505 F.3d at 1065, the evidence establishes that the

---

[51]In examining the genuine issues of fact in this case, this court has enjoyed the benefit of the more complete trial record, and notes that the facts established by the evidence admitted at trial are at some material variance from the facts recited in the parties' summary judgment memoranda.

answer is "yes."

## II.  THE FRAUDULENT TRANSFER CLAIM

This court's findings that the Trust holds the Brighton Ski Cabin in a purchase money resulting trust for Douglas Brown and that it does so as the Browns' nominee under *Holman* effectively vitiates the need to address the Government's alternative theory that the Trust owns the cabin property as the fraudulent transferee of Douglas Brown. Under the purchase money resulting trust, the Browns continued to hold the beneficial interest in the cabin property—and now in the surplus proceeds of its sale—which constitutes "property" or "rights to property" belonging to the taxpayer subject to the United States' tax liens.  *Drye v. United States*, 528 U.S. at 55.

A fraudulent transfer theory, on the other hand, suggests that somehow the Browns' beneficial interest in the subject property was indeed transferred to the Trust,[52] but wrongfully so, and that such a transfer could subsequently be set aside by the Browns' creditors.  This finding would prove to be inconsistent with—even contradictory to— the

---

[52]*See, e.g.*, *Dahnken, Inc. v. Wilmarth*, 726 P.2d 420, 423 (Utah 1986) (stating that the debtor had "assigned all his right, title and interest on the property to his stepfather of 22 years for nominal consideration").  The Utah Fraudulent Transfer Act generally prohibits the fraudulent transfer of assets to defeat creditors, *see* Utah Code Ann. §§ 25-6-5 to 25-6-6, and defines an asset as "property of a debtor, but [not] . . . property to the extent it is encumbered by a valid lien [or] . . . is generally exempt under nonbankruptcy law," *id.* § 25-6-2(2).  If it even could be said that the Browns transferred the cabin property to the Trust at the time of purchase, the "asset" thus transferred for UFTA purposes would be the fair market value of the property *less* the $200,000 trust deed encumbrance in favor of the Jensen trusts and any state law exemption that may have been applicable.

findings already made by this court as to who holds the beneficial interest in the cabin property under the purchase money resulting trust. Where the Browns continued to hold the beneficial interest in the Brighton Ski Cabin, there is no transfer or conveyance needing to be "set aside." *Cf. United States v. Christensen*, 751 F. Supp. 1532, 1536 (D. Utah 1990) (Sam, J.).

## CONCLUSION

Based upon the evidence received at trial, and for the reasons explained in some detail above, this court finds and concludes that the D.E. Brown Family Trust, as record owner of the title to the parcel of real property referred to as the Brighton Ski Cabin from June 23, 1993 until the same was sold at a trust deed sale on November 20, 2009, held that property in a purchase money resulting trust in favor of Douglas E. Brown, the actual payor for its purchase. Consequently, the Browns—not the Trust—owned the beneficial interest in the cabin property. The Trust held title to the Brighton Ski Cabin as the Browns' nominee, and the Browns' beneficial interest in the cabin property constitutes "property" or "rights to property" belonging to the taxpayer within the meaning of 26 U.S.C. § 6321, and as such was subject to certain federal tax liens as enumerated above.

DATED this *11th* day of October, 2011.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge

-61-